## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| Plaintiff, | : | Case No.   1:23-CV-00778 |
| v. | : | |
| CONTENTS OF PNC BANK, ACCOUNT NO. XXXXXX5348, IN THE NAME OF PARTNERS FOR PROGRESS INC., | : : : | |
| Defendant 1, | : | |
| and | : | |
| CONTENTS OF PNC BANK, ACCOUNT NO. XXXXXX3639, IN THE NAME OF PARTNERS FOR PROGRESS INC., | : : : | |
| Defendant 2. | : | |

## VERIFIED COMPLAINT FOR FORFEITURE IN REM

Plaintiff, the United States of America, by its undersigned counsel, alleges the following for its action against the defendants in accordance with Supplemental Rule G(2) of the Federal Rules of Civil Procedure.

### NATURE OF THE ACTION

1.     This is a civil action *in rem* brought to enforce 18 U.S.C. § 981(a)(1)(C), which provides for the forfeiture to the United States of:

> Any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of section 215, 471, 472, 473, 474, 476, 477, 478, 479, 480, 481, 485, 486, 487, 488, 501, 502, 510, 542, 545, 656, 657, 670, 842, 844, 1005, 1006, 1007, 1014, 1028, 1029, 1030, 1032, or 1344 of this title or any offense constituting "specified unlawful activity" (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense.

2.     The term "specified unlawful activity" means, in relevant part, any act which is indictable under 18 U.S.C. § 1343 (relating to wire fraud), as set forth in 18 U.S.C. § 1961(1)(B) and incorporated by 18 U.S.C. § 1956(c)(7)(A).

## THE DEFENDANTS IN REM

3.     Defendant 1 is the Contents of PNC Bank, Account No. xxxxxx5348, in the name of Partners for Progress Inc.   On or about March 19, 2021, the Federal Bureau of Investigation ("FBI") seized funds in the approximate amount of $6,366,476.29 from The PNC Financial Services Group, Inc., The Tower at PNC Plaza, 300 Fifth Avenue, Pittsburgh, Pennsylvania, pursuant to a federal seizure warrant.   The United States has deposited Defendant 1 into the Seized Asset Deposit Fund, where it will remain during the pendency of this action.

4.     Defendant 2 is the Contents of PNC Bank, Account No. xxxxxx3639, in the name of Partners for Progress Inc.   On or about March 19, 2021, the FBI seized funds in the approximate amount of $108,960.32 from The PNC Financial Services Group, Inc., The Tower at PNC Plaza, 300 Fifth Avenue, Pittsburgh, Pennsylvania, pursuant to a federal seizure warrant. The United States has deposited Defendant 2 into the Seized Asset Deposit Fund, where it will remain during the pendency of this action.

## JURISDICTION AND VENUE

5.     Plaintiff brings this action *in rem* in its own right to forfeit and condemn the defendants under 18 U.S.C. § 981(a)(1)(C).   This Court has jurisdiction over an action commenced by the United States under 28 U.S.C. § 1345 and over an action for forfeiture under 28 U.S.C. § 1355(a).

6.     This Court has *in rem* jurisdiction over the defendants under 28 U.S.C. § 1355(b)(1)(A) because the acts or omissions giving rise to the forfeiture occurred in the Southern

District of Ohio.

7.     Venue is proper in this district under 28 U.S.C. § 1355(b)(1)(A) because the acts or omissions giving rise to the forfeiture occurred in the Southern District of Ohio.

### BASIS FOR FORFEITURE

8.     The defendants are subject to forfeiture under 18 U.S.C. § 981(a)(1)(C) because the defendants constitute or are derived from proceeds traceable to conspiracy to commit honest services wire fraud, in violation of 18 U.S.C. §§ 1343, 1346, and 1349.

### FACTS

9.     On July 22, 2021, the United States Attorney for the Southern District of Ohio charged FirstEnergy Corp. in an Information with Conspiracy to Commit Honest Services Wire Fraud, in violation of 18 U.S.C. §§ 1343, 1346, and 1349.   (Case No. 1:21-cr-00086, Doc. 1.)

10.     The United States entered into a Deferred Prosecution Agreement with FirstEnergy Corp. in which the company admitted that the defendants constitute or are derived from proceeds traceable to the offense charged in the Information and consented to the forfeiture of the property to the United States under 18 U.S.C. § 981(a)(1)(C).   (*Id.* at PageID #64.)

11.     The Deferred Prosecution Agreement included a Statements of Facts, which is set forth below, in relevant part.

12.     FirstEnergy Corp. is an Akron, Ohio-based public utility holding company. During the relevant period (2016 until in or about February 2020), FirstEnergy Corp. was the parent company to entities involved in energy generation, including the entity formerly known as FirstEnergy Solutions ("FES").

13.     As of November 16, 2016, FES had a separate and independent Board of Directors from FirstEnergy Corp., and on March 31, 2018, FES filed for Chapter 11 bankruptcy protections.

3

14.     FirstEnergy Corp. also serves as the parent company for FirstEnergy Service Company ("FirstEnergy Service"), which provided financial and other corporate support services to FirstEnergy Corp. and its subsidiaries.

15.     FirstEnergy Corp. and its subsidiaries are subject to civil enforcement by the Securities and Exchange Commission ("SEC") and are regulated directly by the Federal Energy Regulatory Commission ("FERC"), which is an independent agency within the United States Department of Energy ("DOE").   FirstEnergy Corp.'s Ohio utility subsidiaries are regulated directly by the Public Utilities Commission of Ohio.

I.     **Relevant Entities and Individuals**

16.     Executive 1 served in senior executive positions for FirstEnergy Corp. and FirstEnergy Service from approximately 2015 to October 2020.

17.     Executive 2 served in a senior executive position from approximately 2011 until October 2020.

18.     Partners for Progress, Inc. was incorporated in Delaware on or about February 6, 2017, weeks after certain FirstEnergy Corp. senior executives traveled with Public Official A on the FirstEnergy Corp. jet to the presidential inauguration in January 2017.

19.     On or about February 8, 2017, Partners for Progress registered as a foreign nonprofit corporation in Ohio, specifically as a 501(c)(4) entity "to engage in activities consistent with those permitted of an organization exempt from tax under Section 501(c)(4) of the Internal Revenue Code.…"

20.     Although Partners for Progress appeared to be an independent 501(c)(4) on paper, in reality, it was controlled in part by certain former FirstEnergy Corp. executives, who funded it and directed its payments to entities associated with public officials.   For example, FirstEnergy

4

Corp. executives directed the formation of Partners for Progress and decided to incorporate the entity in Delaware, rather than Ohio, because Delaware law made it more difficult for third parties to learn background information about the entity.

21.    Certain FirstEnergy Corp. executives also were involved in choosing the three directors of Partners for Progress, two of whom were FirstEnergy Corp. lobbyists.

22.    Before Partners for Progress was formally organized, Executive 2 directed that $5 million be designated for an unnamed 501(c)(4) in December 2016.

23.    FirstEnergy Corp. exclusively funded Partners for Progress through payments from FirstEnergy Service, which totaled approximately $25 million between 2017 and 2019, approximately $15 million of which was paid to Generation Now.

24.    Certain former FirstEnergy Corp. executives directed Partners for Progress to make payments in 2018, 2019, and 2020, including payments to Generation Now, which helped conceal FirstEnergy Corp. as the source of the payments from the public.

25.    Public Official A represented the State of Ohio's District 72 in the Ohio House of Representatives since January 2017.   Public Official A served as the Speaker of the Ohio House of Representatives from January 7, 2019, to July 30, 2020.

26.    Between 2017 and March 2020, FirstEnergy Service paid more than $59 million ($16,904,330.86 attributed to FirstEnergy Corp. and $43,092,505 attributed to FES) to Generation Now – a purported 501(c)(4), which FirstEnergy Corp. knew was operated for the benefit of and controlled by Public Official A, upon its inception in early 2017.

27.    For example, on March 7, 2017, Individual A emailed wiring instructions for Generation Now to Executive 2, noting that "*[t]his is the organization that [Executive 1] and [Public Official A] discussed.*"   In response, Executive 2 forwarded the email internally and

carbon copied Individual A stating, "*Let's do $250,000 asap and we will do $1M by year-end 2017.*"

28.     Similarly, on August 1, 2017, Executive 2 asked, "*Are we at $500k for the c(4) now?*" to which Individual A replied, "*Yes.*"

29.     Public Official B was the Chairman of the Public Utilities Commission of Ohio ("PUCO") from April 2019, until November 20, 2020, when he resigned.   PUCO regulates FirstEnergy Corp.'s Ohio utility subsidiaries.   Prior to serving as the Chairman of PUCO, Public Official B worked for a private law firm and served as the general counsel for an industrial group of energy users whose interests often conflicted with FirstEnergy Corp.'s interests.

30.     Public Official B also was the sole owner of Company 1 and Company 2, both of which entered into a contract with FirstEnergy Corp. in 2010.   Public Official B, through Company 1, also entered into a consulting services agreement with FirstEnergy Corp., through FirstEnergy Service, in 2013.

31.     Between 2010 and January 2, 2019, FirstEnergy Corp. paid Company 1 and Company 2 over $22 million, including $4,333,333, which was wired on or about January 2, 2019, through FirstEnergy Service to Company 1 for Public Official B's benefit.

## II.     Conduct

32.     FirstEnergy Corp., through the acts of its officers, employees, and agents, conspired with public officials and other individuals and entities to pay millions of dollars to and for the benefit of public officials in exchange for specific official action for FirstEnergy Corp.'s benefit.

33.     FirstEnergy Corp. paid millions of dollars to Public Official A through his 501(c)(4), Generation Now, in return for Public Official A pursuing nuclear legislation for FirstEnergy Corp.'s benefit in his capacity as a public official.   Use of 501(c)(4) entities was

central to the scheme because it allowed certain FirstEnergy Corp. executives and co-conspirators to conceal from the public the nature, source, and control of payments to and for the benefit of Public Official A.

34.     FirstEnergy Corp. paid $4.3 million dollars to Public Official B through his consulting company in return for Public Official B performing official action in his capacity as PUCO Chairman to further FirstEnergy Corp.'s interests relating to passage of nuclear legislation and other specific FirstEnergy Corp. legislative and regulatory priorities, as requested and as opportunities arose.

35.     Primary among FirstEnergy Corp.'s priorities was the passage of nuclear legislation.   FirstEnergy Corp. sought official action from Public Official A and Public Official B in the form of helping draft nuclear legislation that would further the interests of FirstEnergy Corp. and FES and by pressuring and advising public officials to support nuclear legislation for FirstEnergy Corp.'s and FES's benefit.

36.     FirstEnergy Corp. prioritized nuclear legislation in part because of the "decoupling" provision in House Bill 6 that was pursued by FirstEnergy Corp., along with FirstEnergy Corp.'s interest in bailing out the Ohio nuclear plants.

37.     The decoupling provision allowed FirstEnergy Corp.'s Ohio electric distribution subsidiaries to receive a fixed amount of distribution-related revenue from residential and commercial customers based on the 2018 collection period, which was a year of high electricity sales for FirstEnergy Corp.

38.     In addition, the decoupling provision enacted by House Bill 6 allowed FirstEnergy Corp. to continue to recover lost distribution revenue ("LDR") in a fixed amount based on its 2018 LDR recovery, despite the elimination of energy efficiency programs in House Bill 6.   Decoupling

therefore would guarantee FirstEnergy Corp.'s Ohio electric distribution subsidiaries a fixed amount of revenue by tying its distribution revenue to the 2018 level and continued collection of LDR.

39.     FirstEnergy Corp. also relied on Public Official B to help FirstEnergy Corp. address its concern that the future earning power of its Ohio utility subsidiaries would be negatively impacted by the rate distribution case scheduled for 2024.   The electric security plan ("ESP") that FirstEnergy Corp. and its relevant entities were operating under ESP IV was set to terminate in 2024, at which time FirstEnergy Corp. would be required to file a new rate case.

40.     FirstEnergy Corp. believed that the expiration of ESP IV and filing of the new rate case in 2024 would result in decreased revenue and negatively impact FirstEnergy Corp.'s financial outlook, and therefore, sought a "*fix for the Ohio hole.*"

41.     In November 2019, under Public Official B's leadership, PUCO terminated the requirement of FirstEnergy Corp.'s Ohio electric distribution subsidiaries to file a new rate case in 2024.

### A.     Relevant Background

42.     In 2016, FirstEnergy Corp. reported a bleak outlook with respect to its energy generation business.   In its November 2016 Form 10-Q, FirstEnergy Corp. reported a weak energy market, poor forecast demands, and hundreds of millions of dollars in losses, particularly from its nuclear energy affiliate, FES.

43.     FirstEnergy Corp. announced future options for its generation portfolio as follows: legislative and regulatory solutions for generation assets; asset sales and plant deactivations; restructuring debt; and/or seeking protection under U.S. bankruptcy laws for its affiliates involved in nuclear generation.

44. FirstEnergy Corp. repeated these options in its 10-K filed on February 21, 2017, and reported a "*substantial uncertainty as to FES' ability to continue as a going concern and substantial risk that it may be necessary for FES, and possibly FENOC, to seek protection under U.S. bankruptcy laws, which would have a material adverse impact on FirstEnergy's and FES' business, financial condition, results of operations and cash flows.*"

45. FirstEnergy Corp. further noted the following:

> *Based upon continued depressed prices in the wholesale energy and capacity markets, weak demand for electricity and anemic demand forecasts, FES' cash flow from operations may be insufficient to repay its indebtedness or trade payables in the long-term. Although management is exploring capital and other cost reductions, asset sales, and other options to improve cash flow as well as continuing with legislative efforts to explore a regulatory type solution, the obligations and their impact to liquidity raise substantial doubt about FES' ability to meet its obligations as they come due over the next twelve months and, as such, its ability to continue as a going concern.*

46. During FirstEnergy Corp.'s fourth-quarter 2016 earnings conference call on February 22, 2017, Executive 1 focused on legislative and regulatory efforts as follows:

> *In Ohio, we have had meaningful dialogue with our fellow utilities and with legislators on solutions that can help ensure Ohio's future energy security. Our top priority is the preservation of our two nuclear plants in the state and legislation for a zero emission nuclear program is expected to be introduced soon. The ZEN program is intended to give state lawmakers greater control and flexibility to preserve valuable nuclear generation. We believe this legislation would preserve not only zero emission assets but jobs, economic growth, fuel diversity, price stability, and reliability and grid security for the region.*
>
> *We are advocating for Ohio's support for its two nuclear plants, even though the likely outcome is that FirstEnergy won't be the long-term owner of these assets. We are optimistic, given these discussions we have had so far and we will keep you posted as this process unfolds.*

47. In 2017 and 2018, FirstEnergy Corp. attempted to seek relief for its nuclear power generation facilities through a federal solution for its energy generation business. To further a federal solution, certain FirstEnergy Corp. executives met with federal officials and hired

9

consultants with close connections to federal officials to lobby and assist in securing official action to subsidize the nuclear and coal plants through DOE action and the FERC rulemaking process.

48.     FirstEnergy Service also approved a $5,000,000 wire to a 501(c)(4) entity connected to federal official(s), on or about May 1, 2017, shortly after hiring a consultant with close connections to those federal official(s).

49.     By the fall of 2018, FirstEnergy Corp. believed the federal government may not take FirstEnergy Corp.'s requested action.   Accordingly, while FirstEnergy Corp. continued conversations about a potential federal solution, they focused on a state solution to save the Ohio nuclear power plants.

### B.     Public Official A

### *The State Solution for the Nuclear Plants*

50.     At the same time FirstEnergy Corp. had been pursuing a federal solution for its Ohio nuclear power plants, FirstEnergy Corp. was pursing state legislation in Ohio to save the power plants through help from Public Official A, including the ZEN (Zero-Emissions Nuclear Resource Program) energy proposals outlined in House Bill 178, Senate Bill 128, and House Bill 381 in 2017, which failed to gain the support necessary for passage before Public Official A became Speaker in 2019.

51.     For example, on or about November 5, 2016, Executive 1 told Individual B, "*Pass on to [Public Official A]. When we were talking on Weds I told him there was gonna be a sense of urgency but couldn't tell him all the details. If we don't move on some type of supplant in first half of 2017 it will be too late. These plants will be shut, sold, or bankrupt. I don't have any contact info for him.*"

52.     Central to FirstEnergy Corp.'s state solution strategy was payments for Public

Official A's benefit to Generation Now, which was Public Official A's 501(c)(4), as Public Official A pursued the Ohio House Speakership.

53.     The FirstEnergy Corp. payments began in 2017, as Public Official A began executing his strategy to regain the Speakership.   This was consistent with the strategy that Executive 2 had outlined in an internal presentation, explaining that 2017 political contributions are "*strictly money spent to influence issues of key importance to FirstEnergy in 2017, such as saving our baseload generation*" and that FirstEnergy Corp.'s "*preferred manner of giving is through section 501(c) groups, as these are considered 'dark money' because they are not required to disclose where the donations come from*."   The presentation noted that *"the bulk of our contribution decisions are to c(4)s*."

54.     In furtherance of its strategy, in 2017, FirstEnergy Corp., through FirstEnergy Service, wired $1,000,000 to Generation Now consisting of four quarterly payments for Public Official A's benefit, following Public Official A's trip to Washington D.C. with certain FirstEnergy Corp. executives for the inauguration.   These payments were intended to contribute to Public Official A's power and visibility for the speakership and allowed him to support other candidates who would in turn support his speakership.

55.     In return, FirstEnergy Corp. expected and intended that Public Official A and his team would further FirstEnergy Corp.'s efforts to save the power plants.   Throughout 2017, FirstEnergy Corp. executives discussed with members of the Public Official A team ways in which Public Official A could assist with FirstEnergy Corp.'s efforts to save the nuclear power plants.

56.     FirstEnergy Corp. continued to contribute to Generation Now to assist Public Official A in winning the speakership but changed its method of payment in 2018.   Rather than send the money directly from FirstEnergy Service to Generation Now, the FirstEnergy Corp.

11

payments came from Partners for Progress, which had been fully funded by FirstEnergy Corp.

57.     On or about March 15, 2018 – two weeks before FirstEnergy Corp. subsidiaries filed for bankruptcy protection and FirstEnergy Corp. requested emergency action from the Department of Energy – FirstEnergy Corp. wired $300,000 from Partners for Progress to Generation Now for Public Official A's benefit.   Four days before the payment, Executive 1 met with Public Official A to "*[d]iscuss Speaker race and votes needed.*"

58.     Likewise, certain FirstEnergy Corp. executives wired $100,000 from Partners for Progress to Generation Now on or about May 4, 2018, four days before the Ohio primary election.

59.     FirstEnergy Corp. also sent approximately $400,000 for Public Official A's benefit, at Public Official A's request, through another 501(c)(4) in late April 2018, which through a series of transactions ultimately paid approximately $400,000 for media benefiting Public Official A before the May 2018 primary.

60.     FirstEnergy Corp. continued to fund Public Official A's campaign for Speaker leading up to the fall 2018 election. On August 5, 2018, Executive 1 asked Executive 2, "*[Is] [Public Official A] looking for more money?*" to which Executive 2 responded, "*You know the answer to the [Public Official A] question, but I don't know for how much he'll ask. I'll get a list from [Ohio Director of State Affairs] as to the House races he's most interested in winning and I'll have something for you as to what fepac is doing in those races. He'll want hard money first and then C(4) money for sure. I'll be back to you today.*"

61.     Later that day, Executive 2 followed up and said, "*[Public Official A] wants to hear about us – status of company, what's important to us this year and next year. Money will come up – help with key races and C(4).*"

62.     Following a meeting involving Executive 1 and Public Official A, on or about

August 16, 2018, FirstEnergy Corp. wired $500,000 from Partners for Progress to Generation Now for Public Official A's benefit.

63. A few weeks later, on or about August 24, 2018, Executive 1 and Executive 2 arranged for Public Official A to attend a presidential roundtable, during which Public Official A would ask whether Federal Official 1 intended to fix FirstEnergy Corp.'s issues at the federal level.

64. Public Official A told Ohio Director of State Affairs, "*I simply said [Federal Official 1], I'm [Public Official A] former Ohio Speaker and I was planning on discussing this in the Roundtable but the acoustics were horrible. He said yes they were – I couldn't really hear much of anything – I then stated that his support in replacing the CPP was beneficial to Ohio but we need more in order for our zero emissions nuclear plants and coal fired facilities to remain an important part of our overall energy solution. He then stated that he had put a plug in it and now plans to fix it.*"

65. Public Official A reported the same information to Executive 1, explaining "*I opted to talk to him during the photo opt one on one*" and that "*He said they plan on fixing it.*" The following exchange then occurred:

Executive 1: "*Got it. Thanks for the help!*"

Public Official A: "*Thank you for your help.*"

Executive 1: "*We are rooting for you and your team!*"

Public Official A: "*I'm rooting for you as well . . . we are on the same team.*"

66. In October 2018, FES paid Generation Now another $500,000 for Public Official A's benefit – $400,000 of which was hand-delivered to Public Official A during an in-person meeting on or about October 10, 2018.

67. On October 2, 2018, about a week before the payment, Executive 2 told Executive

1, "*I know you know this, but this is where companies and people get in political trouble – everyone is in a rush and they all need a ton of hel$p. Let me gather everything. I'll bring it to you and you/we can decide.*"

68. On October 10, 2018, the day of the meeting, Executive 1 texted Executive 2, "*FES meeting with Public Official A today. I told him to be nice but listen to us.*" Executive 2 replied, "*He'll learn about the $400k at this mtg.*" Executive 1 then responded, "*They better get it done quick or he won't be able to spend it.*"

69. Following the meeting, Public Official A thanked Executive 1 via text for the money from FES, stating, "*$400k... thank you.*"

70. In addition to the $500,000 directly from FES to Generation Now in October 2018, FirstEnergy Corp. made a $500,000 electronic transfer of funds to Dark Money Group 1 for Public Official A's benefit on October 29, 2018, a few days before the November election. This funds transfer occurred after Public Official A traveled to Akron to meet with Executive 1 on October 23, 2018.

71. Following the October 23, 2018 meeting, FirstEnergy Corp., through Executive 1 and Executive 2, also persuaded other energy-interested companies to send payments to Dark Money Group 1 to support Public Official A.

72. For example, following the meeting with Public Official A, Executive 2 texted Executive 1, "*I talked to [Company Executive C]. He's going to contribute $100k to our effort with [Dark Money Group 1]. As for your [ ] Friday morning message to [CEO of Company B]: . . . I met with [Public Official A] a few days ago. We believe in [Public Official A] and think he can and will be Ohio's next Speaker. That's important to all of us. He has a need for a final push. We've committed $700k to the effort and I'd like to ask for your help with $100k.*"

14

73.     A few days later, on October 26, 2018, Executive 2 asked Executive 1 if he could call CEO of Company B "*on the [Public Official A] $100k matter*?" Executive 1 responded, "*I'm on it.*" Executive 2 texted Executive 1 later the same day indicating that Company B is going to do "$100k." Executive 1 responded that "[*Company B Executive*]" should "*take credit with Public Official A too*" and later that day indicated that "*the money has already been wired.*"

74.     In total, following Public Official A's October 23, 2018 trip to Akron to meet with Executive 1, the following payments were made to Dark Money Group 1:

| | | | |
|---|---|---|---|
| October 26, 2018 | $100,000 | wire | Company B |
| October 29, 2018 | $500,000 | EFT | FirstEnergy Service |
| October 29, 2018 | $100,000 | check | CEO of Company C |

75.     The day before the November 2018 general election, Executive 1 texted Public Official A, asking, "*24 hours left. How's it looking*?" Public Official A responded, "*I am encouraged by the House races. Unless this blue wave shows up in the some races – I think we look great.*"

76.     On November 7, 2018, the day after the election, Executive 1 texted Public Official A and asked, "*How did your candidates do*?"  Public Official A responded that "*we were a net -4.*"

77.     Public Official A told Executive 1, "*I literally need 1 more vote for Speaker.*" Executive 1 asked if Public Official A was "*counting [Representative 11] or not*?" and stated, "*I'll make sure it happens.*"

78.     Later that day, Public Official A asked Executive 1, "*[I]f you would just ask [Individual C] to set up a meeting w me and engage in getting this Spkrs race worked out [sic] so the way we want it. That would be perfect. Need him to focus.*"  Executive 1 responded, "*On it.*"

15

79.     FirstEnergy Corp.'s plan to fund Public Official A-approved House races through payments to Generation Now to help get Public Official A elected Speaker in return for introducing nuclear legislation was successful.

80.     On January 7, 2019, the Ohio House of Representatives selected Public Official A as Speaker.   The day of his election, Public Official A texted Executive 1, "*Thank you for everything it was historical*."

81.     In a separate text exchange that day, Individual C texted Executive 1, Executive 2, and two FE lobbyists, "*Congrats [Executive 1] and [Executive 2].   Big win in Ohio Speaker vote*," and then, "*2019 could be FE's year*."   Executive 1 responded, "*Hate to say this but we still need to get DOE help for plants so we can use Ohio to help the parent*."

### *Passage of House Bill 6*

82.     Following Public Official A's election as Speaker, FirstEnergy Corp. executives and representatives worked directly with Public Official A in drafting the nuclear legislation leading up to House Bill 6's introduction in the House.   FirstEnergy Corp. sought the nuclear legislation both for the interests of its subsidiaries, including FES, and to further the interests of the FirstEnergy Corp. parent company.

83.     From when House Bill 6 was introduced in April 2019 to October 2019, FirstEnergy Corp. worked directly with FES to support Public Official A through payments to Generation Now with the intent and for the purpose that, in return, Public Official A would take specific official action relating to the passage of House Bill 6 and the defeat of the ballot referendum initiative to overturn House Bill 6.

84.     FirstEnergy Corp. paid the money to Public Official A through Generation Now intending to influence and reward Public Official A in connection with passage of House Bill 6

16

and defeating the ballot referendum.

85.     During that period, FES paid over $40 million through wire transfers to Generation Now for Public Official A's benefit, while FES was involved in bankruptcy proceedings.   In addition, FirstEnergy Corp. paid over $13 million through wire transfers from Partners for Progress to Generation Now during this period.

86.     Money paid from FirstEnergy Corp. to Generation Now in April 2019 through October 2019 was intended to benefit Public Official A; was intended to help Public Official A in his campaign to pressure and advise public officials to support passage of House Bill 6; and was intended to help Public Official A's efforts to defeat the ballot referendum, which included a plan to pass alternate legislation if the proponents of the ballot referendum gained enough signatures to put the repeal of House Bill 6 on the ballot for a referendum.

87.     Certain FirstEnergy Corp. executives knew that the money paid to Generation Now was controlled by Public Official A and was for Public Official A's benefit to use as he directed. Public Official A and his team instructed how much money to pay into Generation Now to further their efforts to pass House Bill 6 and to defeat the ballot referendum.

88.     A purpose of the Generation Now ads was to provide legislators with the necessary cover to support House Bill 6.   For example, following opponent testimony in a House subcommittee that challenged House Bill 6 on April 23, 2019, Executive 2 told Executive 1, "*Today was opponent testimony. Went long. Expected stuff. Tell [Public Official A] to put his big boy pants on. Ha*."

89.     Later that day, Executive 1 forwarded Executive 2 the content of a message from Public Official A that read, "*I hope FES is ready for a fight because the first shot was fired at us tonight. Nobody screws with my members ... my name ain't [Representative 10] or [Representative*

*1]. I asked [Individual D] to make ads this morning*."

90.    Executive 1 then texted Executive 2, "*FES Needs [sic] to pay for these ads*," explaining, "*they can spend some money on the real fight*."   Executive 1 later texted Public Official A, "*I will be pushing FES to engage*," and then followed up, "*I'll talk to FES tomorrow about paying for [the ads.] What kind of budget*." Public Official A responded, "*I'll find out – I'd like to blister Columbus and eastern Ohio where the shale play is*."

91.    The next day, Executive 1 texted Public Official A, "*Spoke to FES creditor rep. They will step in and help*."   Public Official A responded that he is having breakfast with Individual A to discuss and will call Executive 1 after they meet.   Public Official A responded to Executive 1, "*I may want to run things past [Individual A] to make sure [Individual D] doesn't overcharge. I'm cheap*."   Executive 1 replied to Public Official A, "*OK. I would say you are a bargain – not cheap*."

92.    On May 1, 2019, FES Executive A texted Executive 2, "*Can someone change the Generation Now website so it looks more like our positive commercial? Less conventional power plants, more blue skies, fields and some wind turbines*."   Executive 2 responded, "*[FES Executive A] – don't disagree, but remember, you're just the bank for these spots. They're not yours if you know what I mean. You change them, and they're yours – along with the criticism and results*."

93.    Specific official action by Public Official A relating to the passage of House Bill 6 included helping draft the nuclear bailout legislation at FirstEnergy Corp.'s and FES's direction and pressuring and advising other public officials to take official action to support the nuclear legislation.

94.    While House Bill 6 was pending, FirstEnergy Corp. sought from Public Official A specific official action in the form of pressuring and advising other officials to support the

"decoupling" provision supported by FirstEnergy Corp. and to support an extension of the term of the nuclear subsidy duration to ten years.

95. For example, on April 15, 2019, three days after Public Official A introduced House Bill 6, Executive 2 emailed Executive 1 and several other FirstEnergy Corp. executives and employees about "*talking points*" for "*educating legislators*" relating to the "*decoupling language which we proposed be included in the recently-introduced Ohio Clean Energy Bill (House Bill 6).*" In the same email chain, Executive 2 made clear that the decoupling language in House Bill 6 was the result of coordination with the Speaker's office.

96. In a May 4, 2019 text message, Public Official A told Executive 1 he needed information about FirstEnergy Corp. "*[a]s I begin to enter into the 'all out war' part of the HB 6 debate,*" so that Executive 1 could help Public Official A "*shap[e] an argument*" in gaining support for House Bill 6.

97. On June 27, 2019, while House Bill 6 was pending in the Senate, Public Official A texted Executive 1 that "*House / Senate negotiations are occurring.*" Executive 1 responded, "*Negotiate hard. 10 years and decoupling back in*!"

98. Public Official A then replied, "*10 years*?"; "*[FES Executive B] told me $148M for 6yrs was what was necessary.*" Executive 1 then responded, "*I was told you knew about it. They fucked up. You'll be fighting this same issue in 5 years because they will not be able to take it public without more years.*" Executive 1 later told Public Official A, "*You don't want to have to deal with this twice as Speaker.*"

99. On July 13, 2019, Executive 1 texted Executive 2 and FES Executive A that he told Public Official A "*why 10 years is a must*" and Public Official A is "*on board with pushing HB6 to 10 if he can.*"

100.    On July 16, 2019, FES Executive A texted Executive 1 and Executive 2, "*Speaker is saying he needs at least a little help from Governor to get our years increased*."   The next day, FES Executive A again texted Executive 1, "*House doesn't have quite enough votes*," to which Executive 1 responded, "*[Public Official A] is negotiating. I'm in the loop*."

101.    Later that day, Executive 1 texted Executive 2, "*Some big concessions by the speaker on the budget. Hopefully he did a little horse trading along the way*."   That day, Executive 2 texted Executive 1 and FES Executive A, "*HB 6 passed Committee (with decoupling). 9-4 vote. No additional years for FES – 7 years*."

102.    HB 6 then went back to the House for a vote on the Senate's amendments to the bill, and Executive 2 texted Executive 1, "*Now I'm hearing the Speaker is scrambling for one vote*."

103.    On July 17, 2019, FES Executive A pleaded to Executive 1, "*If we only end up w the 7 years I will do exactly as you say, which is say thank you and go back to my nose on the grindstone*," but, FES Executive A continued, "*[t]hat said, is there anything we can do to get another year or 2? If that is not feasible and all hope is lost, can we get a 2 or 3 year extension option at year 7? We could base it on some type of test of whether FERC has given subsidies etc*."

104.    Executive 1 responded to FES Executive A: "*[State Official 2], [Public Official B], [Company C Executive] and [Official Aide 1] are fighting to the end and we've been talking to them all day. Conference on budget is ongoing and Speakers [sic] delegation is gonna try to negotiate budget movement for tenure on HB6. Everything that can be done is being done. If we don't get it, we work to pass an addendum as soon as [Senator 3] is out*."

105.    On July 23, 2019, the day that House Bill 6 was signed into law with the decoupling provision included, Executive 2 texted Executive 1 a screenshot showing House Bill 6 passing

20

with 51-38 votes, and the following conversation occurred:

> Executive 2: *Boom! Congrats. This doesn't happen without ceo leadership.*
>
> Executive 2: [Image of House vote]
>
> Executive 1: *We made a bbiiiiiiiig bet and it paid off. Actually, 2 big bets. Congrats to you and the entire team! See if [name] has any Pappy and we'll all head to Columbus tonight.*
>
> Executive 2: *Huge bet and we played it all right on the budget and HB 6 – so we can go back for more!*
>
> Executive 2: *No party tonight. We are going to plan one with the Speaker later.*
>
> Executive 2: *You should call the Speaker today.*
>
> Executive 1: *Already texted him…*

### *Defeating the Ballot Referendum*

106.   FirstEnergy Corp. and FES agreed to pay millions of dollars to Public Official A through payments to Generation Now in return for and in connection with Public Official A's efforts to defeat the ballot referendum, which included specific official action by Public Official A.

107.   Specific official action agreed to included efforts by Public Official A to have House Bill 6 interpreted as a "tax" such that it could not be challenged through a ballot referendum under law; and, if the ballot initiative gained enough signatures to put the referendum of House Bill 6 on the ballot, to advance alternate legislation by Public Official A, to include making clear that House Bill 6 was a tax and thus could not be challenged through a ballot referendum.

108.   For example, on July 16, 2019, prior to passage of House Bill 6, Executive 2 texted Official Aide 1 that he "*[j]ust remembered some language added late to House version to help make it harder to challenge via referendum. Speaker worked with fes on it. Senate probably took it out and now folks want it back in*."

109.   On July 24, 2019, FES Executive A texted to Executive 2: "*[Individual H], [FES*

*Executive C] and myself are point on referendum. He has a mtg w [sic] Speaker on it tomorrow. I am talking to Speaker later today....*"

110.    Executive 2 later responded, "*I'm very concerned about the referendum.*"  FES Executive A replied, "*We are taking [Public Official A's] lead on fighting the referendum.*"  FES Executive A replied further, "*Am I supposed to go against what [Public Official A] is telling us to do?*"

111.    Two days later, Executive 2 texted FES Executive A, "*I had a good conversation with [Public Official A] today re: the referendum issue. I think you're in excellent hands. I know more about his personal involvement and engagement. We should all be following his lead. I know you/fes are and we will as well.*"

112.    On September 4, 2019, Executive 2 told Executive 1 he intended to take steps to convince another Ohio public official to publicly state that House Bill 6 was a tax because, under Ohio law, a tax would not be subject to a ballot referendum. In response, Executive 1 texted Executive 2, "*We should check with [Public Official A] to make sure he's on board with this before we step in. He seemed pretty confident in his referendum strategy and plans to pass it as a tax in a new bill if they get enough signatures. Just want to make sure he agrees.*"

113.    To further the scheme, FirstEnergy Corp. used Partners for Progress, a 501(c)(4) controlled by and operating for the benefit of FirstEnergy Corp., to conceal payments to Public Official A.

114.    In October 2019, FirstEnergy Corp. paid $10 million (October 10, 2019) and $3 million (October 22, 2019) to Generation Now for Public Official A's benefit by first wiring the money through Partners for Progress rather than paying the money to Generation Now directly.

115.    FirstEnergy Corp. paid the $13 million at Public Official A's and FES's request,

knowing and with the intent that the money was in return for Public Official A's efforts to defeat the ballot referendum and ensure House Bill 6 became law, to include specific official action for alternate legislation if the ballot referendum received enough signatures to get on the ballot.

116. For example, on October 9, 2019, Executive 1 texted FES Executive A, "*Just got word the $ is being wired today. $10M.*" Executive 1 told Executive 2, "*I did speak with Public Official A and he says they need it and will spend it. Talked to him about future and he says the future is now. He understands it's not our issue and truly appreciates the support.*"

117. In exchange for Executive 1's agreement to wire the $10 million to Public Official A, FES Executive A promised Executive 1 that FES would pay additional funds in connection with the transfer of real estate to FirstEnergy Corp. after FES's bankruptcy.

118. On October 19, 2019, a few days before the ballot referendum's signatures were due, Executive 1 texted Executive 2 and FES Executive B, "*Just spoke to the big guy. He's got the 'tax' bill ready to go and believes he's got [Senator 3] on board….*"

119. FES Executive B responded, "*That is good news. Having both [Public Official A and Senator 3] on board and ready is critical for us next week to be ready to deal with the outcome of the signatures and the court.*" Executive 2 also texted Executive 1, "*I wish we had this state and federal team in place when we first started our generation push. Darn it.*"

120. On October 23, 2019, Executive 1 texted FES Executive A: "*You are a worrier but then it's a pretty big deal. For what it's worth [State Official 3] and [Public Official A] think it's game over. But that's private conversation unless they've told you the same thing. And [Public Official A] has a 'quick fix' anyway.*" Executive 1 further stated, "*[H]e and I have been chatting too. More about raising him $$$$.*"

23

### *Public Official A's Term Limit Ballot Initiative*

121.    In February 2020, Public Official A and his team approached FirstEnergy Corp. about funding a ballot initiative championed by Public Official A, which would change Ohio law to increase term limits for Ohio public officials.   The term limit initiative would allow Public Official A to potentially remain in power as Speaker for up to sixteen additional years, which would give Public Official A additional time as Speaker to further FirstEnergy Corp.'s interests through official action.

122.    For example, on February 28, 2020, Executive 1 and Individual B had the following conversation:

Executive 1: . . . . *Talked to Speaker today. He's an expensive friend.* 😂

Individual B:   *I did not know what he wanted to talk to you about.* 😐

Executive 1: *His term limit initiative. 16 years lifetime max in legislature starting when it passes. No need to switch houses. But after 16 your [sic] done for good.*

Individual B: *I think it's a great idea especially if he stays there*

Executive 1: *He told me he'll retire from there but get [sic] a lot done in 16 more years.*

Individual B: *Probably more than five previous Speakers combined*

Individual B: *He will make Ohio great again*

Executive 1: *Yep*

123.    The next day, Executive 1 texted Public Official A, "*Work with [Individual A] on ballot initiative? You coming up for Home Opener*?"   Public Official A responded, "*Yes. I haven't thought much about Opening Day yet*."

124.    Executive 1 later texted Public Official A, "*[Executive 2] is contacting [Individual A] to do 2 early next week*," to which Public Official A responded, "*Very much appreciated*."

125.    In text message exchanges the next day, Executive 2 stated, "*On Monday/Tuesday of next week, we are hoping to do a $2M contribution from our C(4) to Generation Now,*" and "*[w]e are going to make a significant contribution to Generation Now from Partners for Progress next Monday/Tuesday*."

126.    Executive 2 stated in a subsequent message that Public Official A's term limit initiative "*extends and stabilizes existing leadership – good for the home team*."

127.    On March 3, 2020, FirstEnergy Corp. paid $2 million to Public Official A by wiring the money from FirstEnergy Corp.'s 501(c)(4), Partners for Progress, to Public Official A's 501(c)(4), Generation Now, to advance Public Official A's term limits initiative.

128.    Based on the foregoing facts, the United States asserts that the defendants, the Contents of PNC Bank, Account No. xxxxxx5348, in the name of Partners for Progress Inc. in the approximate amount of $6,366,476.29 (Defendant 1), and the Contents of PNC Bank, Account No. xxxxxx3639, in the name of Partners for Progress Inc. in the approximate amount of $108,960.32 (Defendant 2) constitute or are derived from proceeds traceable to conspiracy to commit honest services wire fraud, in violation of 18 U.S.C. §§ 1343, 1346, and 1349.   Therefore, the defendants are subject to forfeiture to the United States under 18 U.S.C. § 981(a)(1)(C).

## **CLAIM FOR RELIEF**

WHEREFORE, the plaintiff respectfully requests that:

(a)    pursuant to Rule G(3)(b)(i), Supplemental Rules, the Clerk issue a warrant of arrest *in rem*, directing the United States to arrest and seize the defendants and to retain the same in its custody subject to further order of the Court;

(b)    the Court, pursuant to Rule G(4), Supplemental Rules, direct the United States to give notice to all persons and entities having an interest in the defendants to assert, in conformity

25

with the law, a statement of any interest they may have, including notice by publication on the official government website, www.forfeiture.gov, for 30 consecutive days;

(c)    the forfeiture of the defendants to the United States be confirmed, enforced, and ordered by the Court;

(d)    the Court thereafter order the United States to dispose of the defendants as provided by law; and

(e)    the Court award the United States all other relief to which it is entitled, including the costs of this action.

Respectfully submitted,

KENNETH L. PARKER
United States Attorney


s/Deborah D. Grimes
DEBORAH D. GRIMES (0078698)
Assistant United States Attorney
Attorney for Plaintiff
221 East Fourth Street, Suite 400
Cincinnati, Ohio 45202
(513) 684-3711
Deborah.Grimes@usdoj.gov

## **VERIFICATION**

I, Blane Wetzel, hereby verify and declare under the penalty of perjury that I am a Special Agent with the Federal Bureau of Investigation, that I have read the foregoing Verified Complaint for Forfeiture In Rem and know the contents thereof, and that the matters contained in the complaint are true to my own knowledge, except that those matters stated to be alleged on information and belief and as to those matters, I believe them to be true.

The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States, information supplied to me by other law enforcement officers, and my investigation of this case.

I hereby verify and declare under the penalty of perjury that the foregoing is true and correct.

Dated  11/22/23

Blane Wetzel, Special Agent
Federal Bureau of Investigation